# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

Cleatus Marshall,

       Plaintiff,

v.                                   Case No. 16-cv-2651-JWL

General Motors LLC,

       Defendant.

## MEMORANDUM & ORDER

Plaintiff filed this lawsuit against his employer, General Motors LLC ("GM"), alleging that GM demoted plaintiff from a supervisory position to a non-supervisory position on the basis of his race. Plaintiff's race discrimination claim is asserted under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. Plaintiff further alleges that GM demoted him from a supervisory position to a non-supervisory position in retaliation for plaintiff's engaging in protected activity. Plaintiff's retaliation claim is asserted under Title VII. This matter is presently before the court on defendant's motion for summary judgment (doc. 29). As will be explained, the motion is granted with respect to plaintiff's race discrimination claim and is denied with respect to plaintiff's retaliation claim.[1]

---

[1] In the pretrial order, plaintiff also sets forth a failure-to-promote claim based on GM's failure to promote plaintiff to a regular, salaried group leader position by December 2014. Defendant moved for summary judgment on that claim and plaintiff has failed to address that claim in his response. This aspect of defendant's motion, then, is granted as unopposed.

## I.     Facts

The following facts are uncontroverted, stipulated in the pretrial order, or related in the light most favorable to plaintiff as the nonmoving party.  Plaintiff Cleatus "Skip" Marshall, an African-American male, has been employed with defendant General Motors LLC since 1995, when he began working as an hourly employee at defendant's automobile assembly plant in Janesville, Wisconsin.   In 2009, the Janesville plant closed and plaintiff transferred to defendant's automobile assembly plant in the Fairfax district of Kansas City, Kansas.  He has been employed at the Fairfax plant since August 2009.

In December 2013, plaintiff became a "per diem" group leader.  A per diem group leader is an hourly employee assigned to manage 30 to 40 hourly employees.  Per diem group leaders may be terminated at the end of any shift on any day upon notice by management, but generally a per diem group leader assignment lasts at least 12 months.  Prior to his selection, plaintiff submitted a resume and interviewed with Jean Manning and Danean Myers, both of whom were operations managers in the plant's quality department.  Both Ms. Manning and Ms. Myers are Caucasian.  Plaintiff was offered and accepted the per diem group leader position and was assigned to the Quality Department on the third shift.  As a per diem group leader, plaintiff did not receive regular or periodic written performance evaluations.

When plaintiff began his per diem assignment, he reported directly to Ms. Myers.  The record does not reflect any performance-related issues that plaintiff had while working under Ms. Myers' supervision and plaintiff's personnel file contains no documentation of any performance deficiencies during the time period he was supervised by Ms. Myers.  In July 2014, plaintiff began reporting to Ms. Manning.  Ms. Myers did not inform Ms. Manning of any

2

deficiencies in plaintiff's work performance.    At that time, Ms. Manning supervised approximately 10 to 12 group leaders across three shifts, three of whom, including plaintiff, were African-American.    The record contains no evidence of any performance deficiencies during the first seven months that plaintiff worked under Ms. Manning's supervision. Moreover, in December 2014, plaintiff's per diem assignment was extended for an additional 12 months and, in January 2015, plaintiff was selected to assist GM's Wentzville plant during a slow period at the Fairfax plant.    Plaintiff worked at the Wentzville plant for approximately three weeks.

In February 2015, Ms. Manning had a discussion with plaintiff regarding "VTIMs," which are jobs that are not properly processed by the driver on the CARE line.  The CARE line is the final inspection station in the assembly process. Ms. Manning memorialized the discussion by writing that "it was obvious [plaintiff] did not understand the process," and that she had explained the process to him as well as the need to address the team member who had not properly processed the job. [2]   The parties dispute whether this discussion was a one-on-one discussion between Ms. Manning and plaintiff or whether the discussion was a broader group discussion between Ms. Manning and other group leaders.    Ms. Manning avers that this discussion occurred solely between herself and plaintiff.  Plaintiff recalls only that Ms. Manning discussed VTIM issues with all group leaders.    In any event, plaintiff agrees that as a group leader he would have some responsibility for addressing a team member's failure to properly process jobs.  Approximately two weeks later, in late February 2015, Ms. Manning documented

---

[2] While Ms. Manning's notes regarding this discussion are not signed by Ms. Manning or plaintiff, she avers that that she created her notes contemporaneously with the events described therein.

another incident in which plaintiff "[r]an out of Israeli export bags," which are utilized to wrap cars for overseas shipping and that he failed to remedy the situation by arranging for more to be ordered, causing the line to operate without the bags.  It is unclear from the record whether Ms. Manning discussed this issue with plaintiff.  Regardless, these are the first two performance issues documented by Ms. Manning in the first seven months of her supervision of plaintiff.

During a cross-shift meeting on March 3, 2015, plaintiff was giving an end-of-shift report and discussed an incident in which a representative of the plant medical department had mistakenly contacted Edward Tyree, another African-American group leader, rather than plaintiff to report on the status of one of plaintiff's assigned employees.   After plaintiff explained the situation and the apparent mistaken identity, Ms. Manning laughed and said: "Well, all you black guys look alike."  Ms. Manning testified that her comment was directed toward the person who had seemed to confuse plaintiff with Mr. Tyree, noting that individual's apparent inability to distinguish between two African-American supervisors.[3]  Plaintiff testified that he felt humiliated by the comment, in part because Ms. Manning was laughing when she said it and then other members of management laughed in response.  At the end of the meeting, plaintiff approached Ms. Manning and told her that he found her comment to be "derogatory." Ms. Manning testified that she apologized to plaintiff at that time.  Plaintiff testified that Ms. Manning merely stated that the comment "was a joke" and walked away without apologizing to him.

---

[3] Ms. Manning recalled that the individual who had mistaken Mr. Tyree for plaintiff had actually entered the meeting and misidentified plaintiff at the meeting.

On March 23, 2015, Ms. Manning documented a discussion she had with plaintiff about the Business Plan Development ("BPD") board not being up to date and about team leaders failing to complete Safety Observation Tour cards, for which plaintiff had responsibility. One week later, on March 30, 3015, plaintiff reported Ms. Manning's March 3, 2015 comment to Tiffany Brigman, a salaried personnel representative at the plant. One week after plaintiff's report, on April 7, 2015, Ms. Manning was issued a verbal counseling for making the comment. After she received a verbal counseling, Ms. Manning apologized to plaintiff for the comment.

In May 2015, plaintiff was involved in an on-the-job dispute with Michael Peck, a Caucasian group leader. The dispute began when Mr. Peck stated that plaintiff's deficient leadership had contributed to plaintiff's shift failing a recent audit. During the discussion, Mr. Peck became visibly agitated, shouted profanities at plaintiff, and ultimately "chest bumped" plaintiff. Plaintiff reported the incident to Ms. Brigman and Ms. Manning. Ms. Manning responded to the incident by moving plaintiff to a different area within the quality department. Ms. Brigman responded by verbally counseling Mr. Peck (who denied any physical contact with plaintiff) and advising him that future incidents would result in more severe discipline. Shortly after the dispute, plaintiff went on paternity leave. When he returned to the plant, he sent an email dated July 16, 2015 to Rita Derencius, the plant personnel director, in which he pressed defendant to take action against Mr. Peck and questioned Mr. Peck's continued employment with defendant and defendant's commitment to its "zero tolerance" policy with respect to workplace violence. Plaintiff then met with Ms. Manning, Ms. Brigman, Rick Hinzpeter (Ms. Manning's supervisor), and Ms. Derencius about the incident and defendant's response to it. Ultimately, a memorandum was placed in Mr. Peck's file requiring Mr. Peck to participate in a

conflict management webinar and to initiate an Employee Assistance Program counseling session.

In the meantime, Ms. Manning continued to document issues relating to plaintiff's job performance, including plaintiff's alleged inability to understand various systems and processes; weak audit results; failure to execute a Performance Improvement Plan, and reluctance to hold hourly employees accountable for their work. In September 2015, plaintiff counseled Lisa Harris, an employee under his supervision, after she made mistakes relating to the entry of defects into a computer program utilized to track defects on the assembly line. On October 19, 2015, Ms. Manning, during an audit, was made aware of additional mistakes that Ms. Harris had made. Ms. Manning talked to plaintiff about the results of the audit and his failure to address Ms. Harris's performance appropriately. During this discussion, plaintiff told Ms. Manning that he believed she was "targeting" him in retaliation for his March 2015 report to Ms. Brigman about Ms. Manning's race-based comment.

After meeting with Ms. Manning, plaintiff put Ms. Harris "on notice" of formal discipline for continuing to make errors with regard to the entry of defects into the computer program. As an hourly employee, Ms. Harris was entitled to a disciplinary interview before the assessment of formal discipline pursuant to paragraph 76(a) of the collective bargaining agreement. In his two years as a per diem group leader, plaintiff had never participated in a "76(a) interview" or assessed discipline against employees for anything other than attendance-related violations. Prior to conducting the 76(a) interview with Ms. Harris, plaintiff had a discussion with Tim Wells, another manager within the quality department, who reviewed the process for negotiating a disciplinary penalty with plaintiff. Mr. Wells suggested that plaintiff write up a draft of the

6

disciplinary notice. Plaintiff asserts that he asked Mr. Wells for help, but Mr. Wells refused to provide it.

During the 76(a) interview on October 26, 2015, Ms. Harris's union representative requested documentation of Ms. Harris's mistakes. Plaintiff did not have the documentation and spent 30 minutes looking for pertinent documents but could not find them. A labor relations representative present during the interview advised Ms. Manning that the interview was "the worst" he had witnessed. Mr. Wells advised Ms. Manning that it was "very unusual" that plaintiff had not issued any discipline for shop rules violations during his two years as a supervisor. Mr. Wells told Ms. Manning that plaintiff seems "resistant to disciplining hourly employees" and had a "very strong hourly mentality when it comes to accomplishing tasks in his day to day function."

After the 76(a) interview, Ms. Manning consulted with Mr. Hinzpeter as well as Ms. Brigman and Ms. Derencius. Ms. Manning recommended that plaintiff be removed from his group leader position. Management agreed with that recommendation and plaintiff was notified of that decision on November 5, 2015. In that notification, defendant asserted that it was returning plaintiff to his prior position as a Team Member in the body shop as a result of "continued performance issues" including "resistance/hesitant/not capable of assessing discipline to hourly employees" and repeated audits indicating that one of his team members was not entering defects into the computer system properly.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.    Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a).  A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc.*, 726 F.3d at 1143 (quotation omitted).  "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id.* at 1143-44.

## III.    Race Discrimination Claim

In the pretrial order, plaintiff asserts that defendant removed plaintiff from the per diem group leader position and returned him to a non-supervisory position on the basis of his race.[4] Plaintiff concedes that he has no direct evidence of discrimination, and his claim is therefore analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012).  Under *McDonnell Douglas*, plaintiff has the initial burden of establishing a prima facie

---

[4] Plaintiff's discrimination claim is asserted under both Title VII and § 1981. The court applies the same standards and burdens to plaintiff's § 1981 claim as it applies to plaintiff's Title VII claim. *Crowe v. ADT Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 n.3 (10th Cir. 1997).

case of discrimination. *Id.* To set forth a prima facie case of discrimination, plaintiff must establish "(1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination." *Id.* (citing *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007)).  If he establishes a prima facie case, the burden shifts to defendant to assert a legitimate, nondiscriminatory reason for the adverse employment action. *Id.*  If defendant meets this burden, summary judgment against plaintiff is warranted unless he introduces evidence "that the stated nondiscriminatory reason is merely a pretext for discriminatory intent." *Id.* (citing *Simmons v. Sykes Enters.*, 647 F.3d 943, 947 (10th Cir. 2011)).

Defendant, for purposes of its motion, concedes that plaintiff can establish a prima facie case of race discrimination concerning his removal from the per diem group leader position. Defendant moves for summary judgment solely on the grounds that plaintiff cannot demonstrate that defendant's legitimate, non-discriminatory reason for removing plaintiff from the group leader position is pretextual.  According to defendant, it removed plaintiff from the group leader position because plaintiff's performance did not meet the expectations of plant management, particularly Ms. Manning.   Defendant has carried its "exceedingly light" burden to articulate a legitimate, nondiscriminatory reason for plaintiff's demotion.  *See Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011).  The burden of proof, then, shifts back to plaintiff to show that defendant's proffered reason is pretextual.

Evidence of pretext "may take a variety of forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the

action to be taken by the defendant under the circumstances." *Id.* at 1150 (quoting *Kendrick v. Penske Transp. Servs., Inc*, 220 F.3d 1220, 1230 (10th Cir. 2000)).  A plaintiff may also show pretext with evidence that the defendant had "shifted rationales" or that it had treated similarly situated employees differently.  *Crowe v. ADT Servs., Inc.*, 649 F.3d 1189, 1197 (10th Cir. 2011).  In essence, a plaintiff shows pretext by presenting evidence of "weakness, implausibility, inconsistency, incoherency, or contradiction in the employer's stated reasons, such that a reasonable jury could find them unconvincing." *Debord v. Mercy Health System of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013).  In determining whether the proffered reason is pretextual, the court examines "the facts as they appear to the person making the decision, not as they appear to the plaintiff." *Id.*  The court does not "ask whether the employer's proffered reasons were wise, fair or correct" but only whether "the employer honestly believed those reasons and acted in good faith upon those beliefs." *Id.*  The court analyzes plaintiff's pretext evidence below.

Plaintiff first asserts that Ms. Manning's "racially derogatory" remark demonstrates her animus toward African-Americans.  Because the remark, while undoubtedly inappropriate, can only be characterized as a "stray remark" under Tenth Circuit precedent, it cannot support an inference of race discrimination.  *See Hysten v. Burlington N. Santa Fe Ry. Co*., 415 Fed. Appx. 897, 911 (10th Cir. Mar. 16, 2011) (statements made by decisionmakers unrelated to the decisional process are "stray remarks" that are insufficient to establish bias).  The comment was made nearly eight months before the demotion decision.  *See Wagoner v. Pfizer, Inc*., 391 Fed. Appx. 701, 708 (10th Cir. Aug. 12, 2010) (allegedly age-related remark insufficient to establish pretext in part because remark was made approximately nine months prior to termination

10

decision) (citing *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006)). And while the remark was made by a decisionmaker, the uncontroverted facts demonstrate that three other individuals in addition to Ms. Manning were involved in the decision to remove plaintiff from the per diem group leader position. Plaintiff does not suggest that these other individuals—Mr. Hinzpeter, Ms. Brigman or Ms. Derencius—bore any animus against him specifically or African-Americans in general. Moreover, there is no evidence that Ms. Manning made any other remarks related to race at any time. The remark, then, is an isolated one. Finally, the court notes that, while certainly not dispositive, Ms. Manning participated in the decision to hire plaintiff for the per diem group leader. This fact bolsters the conclusion that Ms. Manning's isolated remark, in light of the totality of the circumstances, does not support an inference of discrimination.

Plaintiff also asserts that defendant's "practice" of hiring African-Americans as per diem group leaders as opposed to regular salaried group leaders provides an inference of race discrimination.[5] The court rejects this argument. The evidence in the record is insufficient to establish a "practice" of hiring African-Americans as per diem group leaders rather than salaried group leaders and, more importantly, that any such practice suggests an inference of race discrimination. To begin, there is no evidence in the record concerning how and why defendant decided to hire a "per diem" group leader as opposed to a regular, salaried group leader. There is no evidence as to whether these decisions were based on need or a particular employee's qualifications or experience, or any other reason among the myriad reasons an employer might

---

[5] According to plaintiff, per diem group leaders can be more easily removed from those positions while regular salaried group leaders cannot be terminated without extensive performance discussions and the completion of a Performance Improvement Plan.

have for making such decisions.  There is no evidence in the record about who made the hiring decisions in question.  Without that information, no reasonable jury could conclude that defendant's hiring practices suggest an inference of race discrimination.  Moreover, although plaintiff contends that defendant hired four African-American "per diem" group leaders in the quality department over a three-year period and hired four Caucasian "regular" group leaders over the same period, plaintiff's evidence demonstrates that at least two of the Caucasian group leaders were initially hired on a "contract basis" and only later became salaried group leaders.  Similarly, two of the African-American "per diem" group leaders ultimately became regular salaried group leaders.  Because of the significant gaps in plaintiff's evidence concerning defendant's hiring "practices," that evidence does not permit an inference of discrimination.

Next, plaintiff argues that defendant, in connection with its investigation of the Mike Peck incident, neglected the accounts of African-American witnesses to the incident.  Despite plaintiff's use of the plural "witnesses," plaintiff's evidence on this point concerns only one African-American employee, Clayton Crout.  But plaintiff's evidence does not establish or even suggest that Mr. Crout's account of the incident was neglected or ignored.  According to the evidence, Ms. Brigman, on June 10, 2015, learned that Mr. Crout might have witnessed the incident and she asked Richard Welc, a labor relations representative, to interview Mr. Crout.  The record reflects that Mr. Welc interviewed Mr. Crout on June 11, 2015.  There is no evidence that Ms. Brigman realized prior to June 10, 2015 that Mr. Crout had witnessed the incident and yet decided not to interview him about that incident.  Rather, the evidence reflects only that Mr. Crout was interviewed within one day of management's realization that he may have witnessed the incident.  Moreover, Mr. Welc's documentation of the interview with Mr. Crout reveals that

Mr. Crout's assessment of the incident was consistent with defendant's initial conclusions—that is, Mr. Crout reported that he did not see any physical contact between Mr. Peck and plaintiff. No inference of discrimination is permitted under these circumstances.[6]

Finally, plaintiff contends that a reasonable jury could infer that defendant's asserted dissatisfaction with plaintiff's performance is unworthy of belief.  Specifically, plaintiff highlights that he had no performance-related deficiencies while working for Ms. Myers; that Ms. Manning's notes are "dubious at best" and do not necessarily reflect that Ms. Manning had discussions with plaintiff or disciplined plaintiff for performance-related issues; and that no performance issues were documented prior to Ms. Manning's race-based remark.  Ms. Myers' perception of plaintiff's performance is not relevant in determining pretext; a proper challenge of pretext considers the facts as they appear to the person making the decision, in this case Ms. Manning.  *See Metzler v. Federal Home Loan Bank*, 464 F.3d 1164, 1176 & n.5 (10th Cir. 2006) (differences in the evaluation of an employee's performance do not establish a genuine issue on pretext because different supervisors may impose different standards); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir.2000); *Richardson v. Gallagher*, 553 Fed. Appx. 816, 825 (10th Cir. Jan. 29, 2014) (fact that plaintiff in the past performed in an

---

[6] While it is not clear from his submissions, plaintiff may be alleging that Ms. Brigman discounted the version of events described by Andre Hobson, the African-American team leader who intervened in the dispute between Mr. Peck and plaintiff.  Mr. Hobson apparently reported to Ms. Brigman, while plaintiff was on paternity leave, that he observed physical contact between the two men in the form of a "chest bump."  But Mr. Hobson's report was made two weeks after the incident and after Ms. Brigman had already counselled Mr. Peck over the incident.  Rather than discounting Mr. Hobson's report, she simply determined that additional discipline beyond what had occurred was not warranted.  Moreover, the court cannot conclude that defendant neglected the accounts of African-American employees because Ms. Brigman clearly sought out Mr. Crout to obtain his statement as to what occurred between plaintiff and Mr. Peck.

exemplary manner not pertinent); *Eilam v. Children's Hosp. Ass'n*, 1999 WL 176128, at *4 (10th Cir. Mar. 31, 1999) (positive prior performance does not establish that later unsatisfactory performance evaluation is pretextual). Moreover, as noted earlier, Ms. Manning avers that she created her notes contemporaneously with the events described therein and plaintiff does not otherwise assert how the notes are "dubious." While plaintiff is correct that the notes do not suggest that Ms. Manning always counseled or disciplined plaintiff about a particular issue that she documented, plaintiff directs the court to no evidence suggesting that Ms. Manning was required to do so or that her failure to do so contravened Ms. Manning's regular practice. And while plaintiff is correct that he did not receive any disciplinary action or notification in his personnel file of any performance issues prior to Ms. Manning's race-based remark in early March 2015, the record does reflect that Ms. Manning, on two occasions, documented performance-related issues concerning plaintiff prior to March 2015.[7]

While the court has addressed (and rejected) separately the pieces of circumstantial evidence that plaintiff claims demonstrate a pretextual explanation for his demotion, the court's inquiry is not at an end. The ultimate question on summary judgment for purposes of this case is whether plaintiff has presented sufficient evidence such that there is a genuine issue of material fact concerning whether plaintiff's race actually motivated defendant's decision to remove plaintiff from the group leader position. This question "cannot be answered by looking at the plaintiff's evidence in a piecemeal manner." *Voltz v. Coca–Cola Enterprises Inc.*, 2004 WL 100507, at *9 (10th Cir. 2004). Rather, the court must consider whether plaintiff's

---

[7] In any event, plaintiff's argument concerning the timing of Ms. Manning's remark seems misplaced in the context of plaintiff's discrimination claim (as opposed to plaintiff's retaliation claim perhaps).

14

evidence, taken as a whole, is sufficient to show pretext. *Simms v. Oklahoma ex rel. Dep't of Mental Health & Subs. Abuse Servs.*, 165 F.3d 1321, 1331 (10th Cir. 1999) (noting that the court, in pretext analysis, "must" consider circumstantial evidence in its totality). Ultimately, the court concludes that the facts of this case, viewed in the light most favorable to plaintiff, do not give rise to an inference of pretext in the context of plaintiff's discrimination claim. Plaintiff, then, has failed to meet his burden of demonstrating pretext and summary judgment in favor of defendant is warranted on plaintiff's claim of race discrimination.

## IV.    Retaliation Claim

Plaintiff also asserts in the pretrial order that defendant removed him from the per diem group leader position and returned him to a non-supervisory position in retaliation for his complaints that he had been subjected to racial discrimination and retaliation.[8] The court assesses plaintiff's retaliation claim under the *McDonnell Douglas* framework. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012). To state a prima facie case for retaliation, plaintiff "must show (1) he engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action." *Id.* (quoting *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008)). If plaintiff presents a prima facie case of retaliation, then defendant must respond with a legitimate, nonretaliatory reason for the challenged action. *Debord v. Mercy Health Sys. of*

---

[8] Despite the fact that 42 U.S.C. § 1981 encompasses claims of retaliation, *see CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008), the pretrial order suggests that plaintiff is asserting his retaliation claim only under Title VII.

*Kansas, Inc.*, 737 F.3d 642, 656 (10th Cir. 2013). Plaintiff, then, must show that defendant's stated reason is pretextual. *Id.*

In its motion for summary judgment, defendant contends that summary judgment is warranted on plaintiff's retaliation claim because the evidence viewed in the light most favorable to plaintiff demonstrates that he did not engage in protected opposition to discrimination and, in any event, he cannot establish a causal connection between any protected activity and the decision to remove plaintiff from the group leader position. Defendant further argues that the record evidence is insufficient to permit a reasonable jury to conclude that defendant's proffered reason for plaintiff's termination is pretextual. As will be explained, the court denies summary judgment on plaintiff's retaliation claim in light of material factual issues that must be resolved at trial.

In his submissions, plaintiff contends that he engaged in protected activity on three occasions: Plaintiff's March 30, 2015 report to Ms. Brigman concerning Ms. Manning's race-based remark; plaintiff's July 16, 2015 email to Ms. Derencius in which he complained about a "hostile and stressful work environment" based on the Mike Peck situation; and plaintiff's October 19, 2015 verbal complaint to Ms. Manning in which he told her that she was targeting him in retaliation for his March 2015 report. In its motion for summary judgment, defendant contends that plaintiff cannot establish that his March 30, 2015 report constitutes protected activity because no reasonable person would have believed that Ms. Manning's isolated remark constituted discrimination in violation of federal law. *See Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015–16 (10th Cir. 2004) (plaintiff need not prove actual violation of Title VII but only a "reasonable good-faith belief" that the conduct was prohibited by Title VII).

16

In support of its argument, defendant relies primarily on *Clark County School District v. Breeden*, 532 U.S. 268 (2001), in which the Supreme Court held that no reasonable person could have believed that a "single incident" violated Title VII. The facts of *Breeden* are not analogous to this case. In *Breeden*, two men and one woman met to review applications for a job opening. The woman read aloud a sexually explicit comment contained in one application and the two men "chuckled." *Id.* at 269. The Court determined that because the "ordinary terms and conditions of [the woman's] job required her to review the sexually explicit statement in the course of screening" job applications and that she "conceded that it did not bother or upset her to read the statement in the file," the isolated incident was not so severe as to constitute harassment. *Id.* at 271. Here, plaintiff's evidence demonstrates that his non-African-American supervisor, in the presence of other non-African-American members of management, made a race-based remark directed at plaintiff during a work meeting and that plaintiff was embarrassed and humiliated by the remark. *Breeden*, then, is not persuasive to the court. Moreover, contrary to defendant's suggestion, "opposition clause claims grounded in isolated comments are not always doomed to summary judgment." *See EEOC v. Rite Way Serv., Inc*., 819 F.3d 235, 242-43 (5th Cir. 2016) (one sexually explicit comment made by supervisor and directed at plaintiff was sufficient to require jury resolution of "reasonable belief" question); *Alexander v. Gerhardt Enters., Inc.,* 40 F.3d 187, 195–96 (7th Cir. 1994) (finding that district court did not clearly err in finding that plaintiff reasonably believed that a single racial slur was racially offensive and violated the law); *Corcoran v. City of Chicago*, 2015 WL 1345545, at *5 (N.D. Ill. Mar. 23, 2015) (jury could conclude that plaintiff's report of a single racial slur made by supervisor was based upon a reasonable good-faith belief that the slur constituted discrimination).

17

A reasonable person, unfamiliar with the law, could have believed that Ms. Manning's remark was discriminatory given the specific context. Defendant is not entitled to summary judgment on this issue. *See Duran v. LaFarge North America, Inc*., 855 F. Supp. 2d 1243 (D. Colo. Jan. 9, 2012) ("The Court finds that it is reasonable for an individual without legal training to believe that the use of a racial slur in the workplace, even if it was an isolated incident . . . violates Title VII."). Plaintiff's October 19, 2015 verbal complaint to Ms. Manning also constitutes protected activity for purposes of plaintiff's prima facie case. With respect to this complaint, defendant contends only that plaintiff cannot "bootstrap" his prior unprotected complaint into a second, protected one. But because the court has concluded that, for summary judgment purposes, plaintiff's first complaint was protected, this argument necessarily fails.[9]

Defendant next asserts that summary judgment is appropriate because plaintiff cannot establish a causal connection between any protected activity and defendant's decision to remove plaintiff from the group leader position. In support of this argument, defendant focuses on the eight-month gap between plaintiff's initial complaint about Ms. Manning's remark and his removal from the group leader position. But this argument ignores plaintiff's October 19, 2015 verbal complaint to Ms. Manning in which he alleged that Ms. Manning was targeting him in

---

[9] The court does agree, however, that plaintiff cannot establish that his July 19, 2015 email to Ms. Derencius constitutes protected activity. That email does not mention retaliation or race discrimination or any other possible violation of Title VII. While the email does allege that plaintiff believed he had been subjected to a "hostile and stressful work environment," the email does not indicate that the alleged hostile environment was based on anything other than defendant's handling of the Mike Peck situation, including the fact that Mr. Peck was permitted to keep working at the plant after the incident and, as a result, plaintiff saw Mr. Peck at work every day. In sum, the "hostile environment" alleged by plaintiff stemmed from what plaintiff perceived as defendant's deficient response to a "workplace violence" issue rather than from any alleged violation of Title VII. The July 19, 2015 email, then, cannot form the basis of plaintiff's retaliation claim.

18

retaliation for his March 2015 report. That complaint was made less than three weeks prior to the demotion decision. Because a causal connection may be established through evidence of a close temporal proximity between the protected conduct and the adverse action, *see Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) (holding that close temporal proximity of two weeks between protected activity and termination was "alone sufficient to establish a causal connection"); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (holding that close temporal proximity of twenty-four days between plaintiff's complaint and his termination was sufficient to establish a causal connection), plaintiff's evidence is sufficient to establish the requisite connection.

Because plaintiff has satisfied his burden of establishing a prima facie case of retaliation, the court turns to plaintiff's evidence of pretext.[10] Viewed in the light most favorable to plaintiff, the evidence is sufficient to permit a reasonable jury to conclude that defendant's proffered reason is unworthy of belief. Ms. Manning did not document any deficiencies with respect to plaintiff's employment during the first seven months that he worked under her direct supervision. During this period, plaintiff's per diem assignment was extended for additional 12 months and he was selected to assist GM's Wentzville plant. There is no indication that Ms. Manning perceived any issues with plaintiff's performance during this extended period of time.

According to plaintiff's evidence, he confronted Ms. Manning about her race-based remark on March 3, 2015. After that time, Ms. Manning's documentation of plaintiff's performance issues escalated significantly. In fact, while the record reflects only two instances

---

[10] As noted earlier, defendant has carried its burden of articulating a legitimate reason for its decision—plaintiff's performance did not meet the expectations of plant management.

19

of performance-related documentation between July 2014 and late February 2015, Ms. Manning documented more than a dozen performance-related issues between the time plaintiff confronted her about her remark and the decision to return him to a non-supervisory position.  A jury, then, could reasonably conclude that Ms. Manning's criticisms of plaintiff's performance escalated in response to his complaint.  In addition, the record reflects that Ms. Manning began to document issues that did not necessarily bear on plaintiff's performance, including notations about her apology to plaintiff for the remark and the fact that she had "apologized earlier"; times when plaintiff called into work to indicate that he would not be coming to work; plaintiff's decision to extend his paternity leave; and plaintiff's request for a status update on the Peck investigation. A reasonable jury could conclude, based on the absence of these types of notations prior to plaintiff's complaint, that Ms. Manning was "papering" plaintiff's file in an effort to justify removing him from the group leader position in light of his complaint about her remark.  For the foregoing reasons, plaintiff's claim that defendant removed him from the group leader position in retaliation for plaintiff's protected activity must be resolved by a jury.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 29) is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated this 14th day of November, 2017, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge